**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

SAMIR MOUSSA,                          )
                                       )
             Plaintiff,                )
                                       )
             v.                        )          Civil Action No. 07-9 Erie
                                       )
PENNSYLVANIA DEPARTMENT OF             )
PUBLIC WELFARE and                     )
STACY GEYER                            )
                                       )
             Defendants.               )

**MEMORANDUM OPINION**

McLAUGHLIN, SEAN J., J.

The Plaintiff, Samir Moussa ("Plaintiff"), commenced the instant action against

Defendants, Pennsylvania Department of Public Welfare ("Defendant" or "DPW"), and Stacy

Geyer ("Geyer"), claiming that he was the victim of employment discrimination based on his

race and national origin in violation of Title VII and/or in retaliation for a previous lawsuit he

had filed against the DPW.  Specifically, the Title VII claim alleging race/national origin

discrimination is asserted against DPW (Count II).  Claims for race discrimination pursuant to 42

U.S.C. § 1981 (Count III) and Equal Protection and retaliation claims pursuant to 42 U.S.C. §

1983 (Counts IV and V) are asserted against Geyer.  Both Defendants have moved for summary

judgment and the matter is now fully briefed and ripe for disposition.[1]  This Court has

jurisdiction pursuant to 28 U.S.C. § 1331.

## I. BACKGROUND

On August 4, 2005, Colleen Dahl ("Dahl"), a physical therapist at the Polk Center,

telephoned her supervisor, Alan Petrazzi ("Petrazzi"), and reported that she was being sexually

harassed by the Plaintiff.  Def. Ex. 4.  Petrazzi in turn notified Shigeyo Taylor ("Taylor"), the

Director of Clinical Services.  Def. Ex. 4; Def. Ex. 5. Dahl subsequently met with Petrazzi,

Taylor and Vicki Myers ("Myers"), Human Resource Analyst and Equal Opportunity Liaison for

Polk Center, and reported that the Plaintiff had attempted to kiss her in his office that morning.

---

[1]At oral argument on the Defendants' motions for summary judgement, the Plaintiff abandoned his Title VII
and PHRA claims based on sex.  See Hearing Transcript [Doc. No. 66] pp. 2-3.

Def. Ex. 4; Def. Ex. 5.  Dahl also reported that the Plaintiff had made inappropriate sexual comments to her one year prior thereto and had hugged and kissed her in May 2005.  Def. Ex. 5; Def. Ex. 59.  Taylor observed that Dahl was upset and crying, and noted that she was afraid of the Plaintiff.  Def. Ex. 5.

Dahl also filed an Equal Employment Opportunity Discrimination Complaint with DPW on the same date, setting forth her allegations in detail.  Def. Ex. 6.  The entire Complaint is set forth verbatim below:

> At approx. 9:15 am on Thurs., Aug. 4th, Dr. Moussa stopped me in one of the hallways in Meadowside and said to me that he needed to meet with me at 9:30 am in his office.  I wasn't sure of it was work related or not.  At approx. 9:40 am, I went to his office and knocked on the doorframe of his office.  I asked Dr. if the meeting was work related and he replied, "yes."  He removed some papers from a pink colored recliner in his office and told me to have a seat.  He then sat at his office desk chair by his desk.  He started out by asking casual questions about if I was coaching soccer and if my kids were playing soccer.  I replied to his questions.  He then made a comment to the effect of that I was straining our relationship since I had been ignoring/avoiding him.  (I can't recall his exact words but he was insinuating that he had a crush on me/liked me more than just a friend) and this disgusted me as we have no relationship besides a working relationship.  At some point then he stood up and walked towards me in the recliner.  I stood up and as he got closer to me, I stepped back into the corner (right hand corner of his office all the way in the back and to the right of the recliner).  He continued to approach me and was right in my face.  I began to turn away from him and I was turning toward the corner, he put his arms around my waist.  He still had his arms around me and he was pulling me toward him and he was trying to pull me around to facing him.  I tried pulling away and he tried to kiss me as I kept trying to turn away, but he did kiss my right cheek.  My hair was drapped over my cheek.  I told him "No" repeatedly while he had a hold of me and to not do it.  I told him to leave me alone.  He let go and then grabbed me again while I was facing the corner and I pulled away telling him no again.  He then let go of me.  He then said something about how could I do this to him, and he didn't know how he could handle it.  I told him that he was married and I was happily married.  He then asked me "just one?" and I told him again no.  I believe he meant that he wanted to kiss me.  He then went back to his office chair and sat back down.  He then said something again about he didn't know how he could handle it.  I don't recall if I replied or not.  I did then tell him several times, that he needed to stop as he was going to ruin our work and friend relationship.  I was scared and just wanted out of his office.  He next went on to ask me about an individual's upper extremity brace and asked if I would go look at him with him.  I think I then sat back down on the edge of the recliner seat.  I told

2

him I would go look at the brace with him as the O.T. wasn't currently in the building.  On the way out of the office he made a comment to me that he really needed to do something about the 2 acne spots on my face.  I waved my arm at him as to "shoe" him away and then walked out of his office and he walked out also.  As we were walking, he told me about in Egypt you can have 4 wives. He then asked what state is it that you can do that here (in the U.S.).  I replied "Utah."  He then said "we" should go there and I told him, no, just he should go there.  We then went to the cottage and looked at the brace without any incident.  When he was done adjusting the brace and looking at her arm, he went to the chart rack to get a chart and I went to use the phone to respond to a page I received while we were looking at the brace.  I called Marty, the Adaptive Equip. tech who had paged me.  He said he could meet right then about an individual's w/c and I told him I would contact Amy, the OT to see if she could meet then also.  Amy said she could meet and I called Marty back and told him we could meet at that time.  Since Marty was coming from Walker Hall and Amy from Terrace, I decided to go do a treatment in cottage A2, Meadowside.  I was very upset about the incident earlier and had cried some, but wiped away my tears before entering cottage A2. When I walked into cottage A2, Dee, an RSA, looked at me and said "what's wrong."  I replied, "nothing" as I didn't want to talk about what happened.  She replied back that she could tell something was wrong.  I then went and completed my treatment and then headed to cottage A1 and Amy was sitting at the desk waiting for me.  I was still very upset and felt that I was going to start crying again.  I asked Amy to come with me to the cottage bathroom and I told her what happened earlier with Dr. Moussa. Vicki Johnson, RSW, later walked by the bathroom and stopped to talk.  After a minute of causal talk, Amy and I walked back into the cottage and met with Marty to do a wheelchair assessment.  During the assessment, Marty left to go get the digital camera.  While he was gone, I talked more to Amy about what had happened.  We were in the first bedroom area to the left as you walk in Meadowside A1 with the curtain closed.  I began to cry again and was crying while we were talking.  Marty later returned and saw me crying.  I walked out to the restroom to get a towel to wipe away my tears and returned to complete our assessment.  After we completed the assessment on the cottage, Amy, Marty and I went down to Meadowside P.T. dept. and downloaded the pictures that we had previously taken and discusses (sic) some options and then called over our P.T. Aide, Sue Ruhlman to discuss the options. After our discussion was completed, Amy and Marty left and Sue returned to her desk across the room.  I then picked up the phone to call Alan, my supervisor, around 11:30-11:40 am to advise him of the incident that had occurred earlier in the morning.

I wanted to report this as I feel that I have been violated and can not trust Dr. Moussa.  He has no right to touch me nor to make me believe that he needs to meet with me about something work related and then make advances at me.  He had an incident before

(see information below), but I hoped it would be isolated, however, after what happened this morning, I am disgusted, hurt and don't want it to happen to me again or anyone else.

Sometime, during the week...week and a half before Memorial Day Weekend 2005, Dr. Moussa had stopped me and asked me to stop by his office as he wanted me to meet with him and he had something for me. When I approached his office door, he came to the door way and came right up to me without warning and put his arms out and then put them around me and hugged me, he then attempted to kiss me and I turned away trying to get away from him and he kissed me on the cheek as I was turning away from him. I told him I didn't know how his wife could manage to deal with him (his behavior). He then told me that I needed to start signing in/out of work at his office and I replied sarcastically, "yeah right." He then gave me a cup from one of the drug reps that he had received. I left his office and took the cup with me. I did not report this to my supervisor as I was hoping it was just an isolated incident and if I ignored Dr. Moussa, he would get the hint to leave me alone. I did however, mention this incident to Amy Cunningham, Marty Stoops, and Rob McDonough, coworkers of mine.

There were several other occasions, when I would see the dr. (sic) in the hallway and he would tell me that I was to sign in/out of work at his office. I told him numerous times, that Alan is my boss and I sign in/out of work at Center where I am supposed to. Dr. Moussa had stopped me at least 2 other times between the end of May and today, Aug. 4th requesting me to meet him at his office and I did not go as I was afraid of what he might do. I ignored his meeting requests. I would go another direction if I heard him in the building so I could avoid him. If I would see him in the hallway, I would ignore him, tell him I sign in/out at center or wave my arm at him to "shoe" him away if he said anything to me such as requesting me to sign in/out a[t] his office, telling me I looked nice, pointing out acne on my face or asking when I was going to meet with him. (things that were not work related.)

Def. Ex. 6.

On August 5, 2005, the Plaintiff completed an Employee Relations Witness Statement as part of an interview conducted by Myers and Jeff Barnes ("Barnes"), Human Resource Analyst. Def. Ex. 16; Def. Ex. 17, Moussa Dep. p. 72. That statement provided in relevant part:

[O]n 8-4-05 while doing 90 day physical examination in Cottage D at about 8:00 AM, I met Colleen Dahl (PT) in Cottage D and I told [her] we need to meet to discuss S.B. fracture and her crying and we check brace. While I was in my office at about 9:30 to 9:45 I was entering the 90 days finding in my computer, Colleen came to my office so I removed chart from the [r]ecliner, so she can sit in the recliner, then we discussed the cause of S.B. crying and we

4

> need to remove the brace to make sure that there is no skin breakdown and I ordered x-ray to the fractured arm. After that we talked socially for 2-3 minutes about coaching in Meadville Soccer Team which explains why her van was so muddy, and I complimented her about her [n]atural [b]eauty without any makeup however her response was complete silence which made [me] realize that she did not appreciate the compliments. She stood up ready to [leave] and she stated that Sherry (OT) was not available, because she is the one to deal with upper extremity. So I told her that I should ... wait for Sherry to change the brace, however Colleen told me that she had time and she will help me checking the [b]race, so we left my office and I prompted her with my left arm on her right shoulder and we went to Cottage D1. There is no further physical contact other than [t]apping her on the back of her right shoulder with my left hand. The only recent physical contact I had with Colleen was when I returned from Geriatric Conference I asked her in humorous way if she missed me and I spread my arms and we did have brief hug in the [h]allway ([a]bout May or April 2005), near the main [d]ispensary in Meadowside. Also I gave her some pens and cup which I brought from the Medical Conference as I gave to all the nurses and OMRPs.

Def. Ex. 16.

At the conclusion of this interview, Barnes informed the Plaintiff that he was suspended without pay pending further investigation. Def. Ex. 18, Moussa Dep. pp. 104-105. This suspension was subsequently confirmed in writing by letter dated August 12, 2005 signed by Terry Lee Fossati ("Fossati"), Human Resource Officer for Polk Center. Def. Ex. 19.

Ken Krall ("Krall"), an employee from the Defendant's Bureau of Equal Opportunity ("BEO"), obtained a second statement from Dahl on August 15, 2005. Def. Ex. 20; Pl. Ex. 3, Hanwell Dep. p. 41. Dahl reiterated her allegations and also informed Krall that she had filed a complaint with the Pennsylvania State Police. Def. Ex. 20. Krall obtained a second statement from the Plaintiff, who again denied Dahl's allegations. Plaintiff suggested that Dahl had fabricated the allegations because she thought he had "money" and could "sue [him] for harassment," or she was "bragging about having a physician attracted to her." Def. Ex. 21.

As part of its investigation into Dahl's allegations, a number of DPW employees were interviewed relative to Dahl's alleged encounter with the Plaintiff on August 4, 2005. Specifically, Deirdre Williams ("Williams"), a Residential Services Aid, recalled asking Dahl "what was wrong" when she entered Cottage A2 because in Williams' view Dahl did not appear to be "feeling good." Def. Ex. 7. Similarly, Vicki Johnson ("Johnson"), a Residential Services

5

worker, "thought [Dahl] was upset about something" because she was "wiping her eyes."  Def.
Ex. 9.  Marty Stoops ("Stoops"), an Adaptive Equipment Technician, recalled that Dahl was
"crying."  Def. Ex. 10.  Amy Korinko ("Korinko"), a Licensed Occupational Therapist, reported
that Dahl informed her that the Plaintiff had attempted to kiss her in his office and that when she
made the comment Dahl was "very upset, pale and crying."  Def. Ex. 8.  Robert McDonough
("McDonough"), a Physical Therapy Assistant, stated that although he was unaware of the
incident on August 4, 2005, Dahl had informed him that the Plaintiff made inappropriate
comments to her on four or five occasions in the past and had tried to hug her two or three times.
Def. Ex. 14.

The BEO prepared an Investigative Report summarizing the results of its investigation up
to that point:

> This seems to be a case of the Complainant's word versus the
> Respondent's as to the alleged sexual harassment since there are no
> witnesses to the incident.  The Complainant, however, seemed to
> be credible, appears to have no reason to lie, and when asked how
> she would like this resolved, indicated that she just didn't want to
> ever be around Dr. Moussa again and did not want this to happen
> to anyone else.  (See Exhibit A) Additionally, she discussed the
> incident with several coworkers and all related a consistent account
> of the incident as well as a consistent description of the
> Complainant's demeanor on August 4th.  Also, the Complainant, in
> her statement, indicated that she had filed a complaint with the
> State Police on Monday, August 8, 2005.
>
> Dr. Moussa, while denying the allegations, also appeared credible.
> However, he did not give a very plausible explanation as to why he
> thought the Complainant would have a reason to make such
> allegations.  (See Exhibit B).

Def. Ex. 24.

On September 14, 2005, Merry-Grace Majors, the BEO Director, forwarded a
memorandum to Kevin Casey, Deputy Secretary for Mental Retardation and Joseph Tatarek
("Tatarek"), Acting Facility Director at Polk Center, indicating that based upon information
obtained during the investigation, there was sufficient evidence to substantiate a violation of the

Commonwealth's policy on sexual harassment.[2]  Def. Ex. 25; Def. Ex. 26.

Michael Hanwell ("Hanwell"), a Supervisory Analyst with the Bureau of Human Resources, Labor Relations, reviewed the BEO Investigative Report, as well as the witness statements collected by Barnes and Krall.  Pl. Ex. 3, Hanwell Dep. pp. 44-45.  He recommended that further investigation be conducted.  Pl. Ex. 3, Hanwell Dep. pp. 44-45.  Additional interviews were conducted, and Korinko was reinterviewed and reported that Dahl had also informed her of an incident that had occurred before Memorial Day, 2005, wherein the Plaintiff had attempted to kiss her.  Def. Ex. 12.  McDonough reported that Dahl informed him that the Plaintiff had made the following comments to her: "Why don't you come to my office when I want you to;" "you know where I come from we're allowed to have more than one wife;" and "what would it take for us to be together."  Def. Ex. 15.  In supplemental interviews, Dahl was asked to provide the specifics of the alleged inappropriate sexual comments made to her by the Plaintiff.  Def. Ex. 29; Def. Ex. 35.  Dahl stated that the Plaintiff had asked her: "Do you know what a big dicked man has for breakfast?"  Def. Ex. 29; Def. Ex. 35.

As the investigation proceeded, allegations of inappropriate conduct by the Plaintiff against other women came to light.  Barnes interviewed Ellen Leakes ("Leakes"), a former DPW employee, on November 28, 2005 and December 7, 2005, who informed him that the Plaintiff had physically and verbally harassed her on several occasions.  Def. Ex. 46.  Specifically, Leakes stated that the Plaintiff made comments such as "I think no means maybe" and "I can give you

---

[2]Sexual harassment under the Policy was defined as:

...unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature if:

    a.  submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment; or

    b. submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individuals; or

    c. such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.

Pl. Ex. 10.

three nights a week." Def. Ex. 46. Leakes further relayed that on one occasion, while driving back to Polk Center, the Plaintiff stated that he wanted to have sex with her in the car, but she declined his advance. Def. Ex. 46. On another occasion, the Plaintiff allegedly "slammed her against the wall" of her office and "had his tongue down her throat" while attempting to remove her clothing. Def. Ex. 46. Leakes claimed that the altercation left her bruised. Def. Ex. 46.

Leakes also reported that she declined the Plaintiff's request to have lunch with her shortly prior to her retirement. Def. Ex. 46. Rindy Taylor ("Taylor"), another DPW employee, stated that she overheard Leakes' end of the telephone conversation and questioned Leakes as to why she declined the luncheon invitation. Def. Ex. 47. According to Taylor, Leakes informed her that she had declined the Plaintiff's invitation because he was unable to "keep his hands to himself." Def. Ex. 47. Leakes claimed she did not report the Plaintiff's conduct at that time because she was concerned for her safety and was "fearful" of how she would be treated by the "system." Def. Ex. 46. She further claimed her decision to retire was based, in part, on the Plaintiff's conduct. Def. Ex. 46.

Barnes and Fossati also interviewed Michael Kudylak ("Kudylak"), the acting Director of Unit Managers. Def. Ex. 50. Kudylak informed Barnes and Fossati that he was aware of the incident that had occurred between the Plaintiff and Leakes in her office at the time and that he further concluded that it was "unsolicited" and "unwanted." Def. Ex. 50. According to Kudylak, Leakes did not want to report the incident because she was embarrassed and feared retaliation from the Plaintiff. Def. Ex. 50. He did, however, take steps to ensure that her job duties did not require her to be alone with the Plaintiff. Def. Ex. 50.

In an interview on November 29, 2005, Julianna Lewis, R.N. ("Lewis"), reported that in approximately 2001, she was in the main dispensary area at Woodside when the Plaintiff walked in, grabbed her and kissed her on the lips. Def. Ex. 48. Lewis indicated that she pulled away from him and asked him "what he would do if someone [did] that to his wife." Def. Ex. 48. Lewis informed Barnes that she was surprised and upset by the Plaintiff's "bold" actions, but had not filed a complaint at the time because it was an isolated incident and she had to continue working with the Plaintiff. Def. Ex. 48.

Three Preliminary Discipline Conference ("PDC") Hearings were held which were

attended by the Plaintiff, a Union Steward from the Plaintiff's Union and DPW management.
Def. Ex. 33 (October 25, 2005); Def. Ex. 45 (November 16, 2005); Def. Ex. 52 (December 19,
2005).  Plaintiff denied engaging in the conduct described by Dahl, Leakes and Lewis.  Def. Ex.
33; Def. Ex. 45; Def. Ex. 52.  Plaintiff contended that Leakes fabricated the allegations because
she was jealous of his relationship with another female employee.  Def. Ex. 52 p. 2.  Plaintiff
claimed that Leakes had "made it clear" to him that she was "available."  Def. Ex. 52 p. 2.  He
did acknowledge, however, giving Leakes a gift upon her retirement in Ms. Taylor's presence.
Def. Ex. 52 p. 2.  Plaintiff stated that Lewis fabricated her allegation against him because he had
"trouble" with the nursing staff in 2001 and had complained to Lewis' supervisor that she was
"spying" on him.  Def. Ex. 52 pp. 6-7.

On December 22, 2005, Barnes forwarded a Request for Disciplinary Action to Hanwell's
superior, Kathy Thomas ("Thomas"), the Chief of the Labor Relations Section, summarizing the
results of the investigation and requesting termination of the Plaintiff.  Def. Ex. 58.  Thomas in
turn submitted a Request to Effect Action on December 23, 2005 requesting permission to
remove the Plaintiff from his position as a Staff Physician.  Def. Ex. 59.  This Request was
signed by Sam Lamonto, the Director of the Division of Employee Relations and Development,
and Jay Bausch, the Acting Director of the Bureau of Human Resources and stated, in relevant
part:

> During its investigation of Ms. Dahl's allegations, Polk
> management learned that Dr. Moussa had engaged in similar
> conduct with two other female employees.  One employee (now
> retired) reported that in 2001, Dr. Moussa had forced her against
> the wall, kissed her on the mouth and attempted to remove her
> clothing.  She also reported that he repeatedly told her that he
> wanted to have sex with her and he persisted with these comments
> even after she told him his advances were not welcomed.  A
> second employee reported that in 2001, Dr. Moussa grabbed her
> without warning or invitation and kissed her on the lips.
>
> During the course of three PDCs held with Dr. Moussa, he denied
> that the conduct reported by Ms. Dahl had ever occurred.  He also
> said that he never kissed the second employee or told her that he
> wanted to have sex with her.  He stated that she was fabricating the
> allegation because she was jealous of a friendly relationship he has
> with another female employee.  He also denied the allegation made
> by the third worker, saying that she must have made up the
> allegation because he was having problems with nursing staff in
> 2001 and that she could be jealous because the nursing staff does

not like to "share" the doctors with others.

> Management believes the three employees are credible and that the
> conduct described by them actually occurred.  While the former
> employee has indicated her reluctance to testify (attempts to solicit
> her cooperation will continue to be made), OMR has expressed its
> willingness to proceed with removal nonetheless, as it views this
> behavior as intolerable.  Dr. Moussa's denials and attempts to
> explain why these women would fabricate their accounts are not
> credible or believable.  Based on the nature of the conduct
> described, Polk Center cannot continue to employ Dr. Moussa and
> ensure that no other staff will be similarly approached.  Based on
> this, there is no alternative but to remove him from employment.

Def. Ex. 59.

On December 29, 2005, the Plaintiff was notified by letter that he was terminated from

his employment effective January 4, 2006 on the basis that his actions violated DPW's Sexual

Harassment Policy.  Def. Ex. 60.  This letter was signed by Geyer, who began her employment

with DPW on November 5, 2005.  Geyer Ex. 2, Geyer Dep. p. 6.  She played no part in the

investigation, and was simply directed to sign the letter by her supervisor, Nancy Murray

("Murray"), given her position as Facility Director.  Geyer Ex. 2, Geyer Dep. pp. 10-14.  This

letter summarized the results of the investigation and stated:

> Pre-disciplinary conferences were held with you on October
> 25, November 16, December 19, 2005 and the responses you
> provided were unacceptable.  Note that either your actions toward
> C.D. on August 4, 2005 or your described physical interaction with
> E.L. would warrant removal from employment.

Def. Ex. 60.

At deposition, Hanwell described the approach utilized by DPW in deciding the

appropriate level of discipline in any given case:

> Q.     ... And what's the procedure that you go through to apply
>        those policies to a particular incident?
>
> A.     Well, the facts of the case are gathered, analyzed, clearly
>        understood and then the due process needs to be completed
>        before the [determination] can be made as to what penalty
>        is appropriate.  And with input from the program office
>        they need to weigh in on the level of penalty that they
>        desire, and our office makes a determination as to whether
>        or not from a just cause standpoint, in accordance with the
>        collective bargaining agreement's provisions, with respect
>        to discipline, if the action is supportable.  And we look to
>        match the facts against the prescribed policies and the

> history within the department. Is it consistent with what
> we've done in other instances of a similar nature? So it's
> not strictly driven by prescription. There are other elements
> that come into play.

Pl. Ex. 3, Hanwell Dep. pp. 54-54. Hanwell also testified as follows concerning DPW's reasons

for terminating the Plaintiff:

> Q.    In other cases, what options would be available besides
>       removal and full restoration?
>
> A.    Well, any time a disciplinary determination is made, the
>       actions could range from no action, which would be what's
>       signified by the full restoration for somebody who is on
>       suspension pending an investigation, to removal, with
>       options available in between anywhere from an oral
>       reprimand or reprimand to suspension of any number of
>       days.
>
> Q.    All right. And why was there no consideration of a
>       reprimand in this case?
>
> A.    Well, what this case came down to from our technical
>       analysis was one of credibility, and what I meant by that
>       statement was that if we believe — that is the department,
>       we believe that what Ms. Dahl alleges is true, then the
>       appropriate action for something of that level of seriousness
>       would be removal from employment. If we did not believe
>       her version and instead believed Dr. Moussa's version,
>       there should be no action.
>
> Q.    What was it about the allegations that ruled out a
>       reprimand?
>
> A.    Well, there was — again, it was more or less an all or
>       nothing scenario. There was no — behavior of that sort is
>       not the sort of behavior that I have ever seen the department
>       respond to with anything less than removal.
>
> Q.    Was there any rule, regulation, policy that would preclude
>       suspension?
>
> A.    I don't think there was anything that would have precluded
>       it.
>
> Q.    So a termination was mandatory based on policy, that was a
>       judgment that was made by management?
>
> A.    It was a judgment that was made by management in a way
>       that was consistent with the history within the department
>       and with the policies that govern this sort of conduct.

Pl. Ex. 3, Hanwell Dep. pp. 73-75.

At the time of his termination, the Plaintiff was a member of the Pennsylvania Doctors'
Alliance and he subsequently filed a grievance regarding his termination.  Def. Ex. 69, Garin
Dec. ¶ 16.  The grievance machinery provided for a three-step process.  Def. Ex. 69, Garin Dec. ¶
19.  If the grievance could not be informally resolved initially, it proceeded to a Joint State
Committee panel made up of three representatives from the Pennsylvania Doctors' Alliance and
three DPW representatives.  Def. Ex. 69, Garin Dec. ¶ 19.  In the Plaintiff's case, the grievance
was considered by the Joint State Committee panel, who rejected the Plaintiff's request for
reinstatement stating:

> The grievance is resolved as follows: the grievant shall be given
> the opportunity to submit a letter of resignation.  If the grievant
> submits a letter to the Human Resources Office at the Polk Center
> by COB December 19, 2006, then the removal action shall be
> converted to a resignation in lieu of discharge effective 8/5/2005.
> If he does not, then the removal action stands.

Def. Ex. 1.  Plaintiff thereafter submitted a letter of resignation on December 12, 2006.  Def. Ex.
2.

## II. STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories
and admissions on file, together with the affidavits, if any, show that there is no genuine issue as
to any material fact and that the moving party is entitled to judgment as a matter of law."
Fed.R.Civ.P. 56(c).  In order to withstand a motion for summary judgment, the non-moving party
must "make a showing sufficient to establish the existence of [each] element essential to that
party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v.
Catrett, 477 U.S. 317, 322 (1986).  In evaluating whether the non-moving party has established
each necessary element, the Court must grant all reasonable inferences from the evidence to the
non-moving party.  Knabe v. Boury Corp., 114 F.3d 407, 410, n.4 (3d Cir. 1997) (citing
Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986)).  A factual dispute is
"material" only if it might affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477
U.S. 242, 248 (1986).  "Where the record taken as a whole could not lead a reasonable trier of
fact to find for the non-moving party, there is no 'genuine issue for trial.'"  Id.  (quoting

Matsushita, 475 U.S. at 587).

### III. DISCUSSION

*Plaintiff's substantive discrimination claims under Title VII and § 1983* [3]

Under Title VII, it is unlawful for an employer to refuse to hire or otherwise discriminate against any individual with respect to his or her compensation, terms, conditions or privileges of employment because of such individual's race, color, religion, sex or national origin. See Weston v. Commonwealth of Pennsylvania, Dept. of Corrections, 251 F.3d 420, 425 (3rd Cir. 2001), citing 42 U.S.C. § 2000e-2(a)(1). Under the familiar burden-shifting test articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973), and further refined in Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 252-53, (1981), and St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1983), the plaintiff has the initial burden of establishing a prima facie case of discrimination, the substance of which will vary depending on the type of claim; if the plaintiff is successful, the employer must then articulate a legitimate, non-discriminatory reason for the adverse employment decision. Goosby v. Johnson & Johnson Medical, Inc., 228 F.3d 313, 319 (3rd Cir. 2000); Krouse v. American Sterilizer Co., 126 F.3d 494, 500 (3rd Cir. 1997). If the employer proffers a legitimate, non-discriminatory reason for its action, the plaintiff must then demonstrate that the proffered reason was merely a pretext for unlawful discrimination. Goosby, 228 F.3d at 319, citing Reeves v. Sanderson Plumbing Products Inc., 530 U.S. 133 (2000); Pivirotto v. Innovative Systems, Inc., 191 F.3d 344, 352 n.4 (3rd Cir. 1999).

To establish a prima facie case of discrimination, the Plaintiff must show that: (1) he is a member of a protected class; (2) he was qualified for the position that he held; (3) he suffered an adverse employment action; (4) under circumstances that give rise to an inference of unlawful

---

[3]As indicated, the Plaintiff asserted claims against Geyer under 42 U.S.C. §§ 1981 and 1983 (Counts III and IV). However, no private right of action lies against a state actor under § 1981. See McGovern v. City of Philadelphia, 554 F.3d 114, 121 (3rd Cir. 2009); see also Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 733 (1989); Ford v. SEPTA, 2010 WL 1141380 at *1 (3rd Cir. 2010). Therefore, summary judgment is appropriate with respect to the Plaintiff's § 1981 claim against Geyer. The substantive elements of an employment discrimination claim under § 1983 are nearly identical to those of employment discrimination under Title VII. See Stewart v. Rutgers, The State University, 120 F.3d 426, 432 (3rd Cir. 1997) (§ 1983 claim). The Third Circuit has consistently applied the McDonnell-Douglas burden-shifting framework to discrimination claims brought pursuant to this section. Stewart, 120 F.3d at 432 ("Our application of the *McDonnell Douglas-Burdine* framework is applicable to Stewart's allegation of racial discrimination under [42 U.S.C. § 1983].") (footnotes omitted). Therefore, any analysis under Title VII is equally applicable to the Plaintiff's § 1983 claim.

discrimination.  <u>Pivirotto</u>, 191 F.3d at 357; <u>Waldron v. SL Indus., Inc.</u>, 56 F3d 491, 494 (3rd Cir. 1999); <u>Johnson v. Keebler-Sunshine Biscuits, Inc.</u>, 214 Fed. Appx. 239, 241 (3rd Cir. 2007). Here, there is no dispute that the Plaintiff is a member of a protected class, was qualified for the position that he held and that he suffered an adverse employment action when he was terminated by DPW.  Defendants argue that the Plaintiff cannot establish a prima facie case of either race or national origin discrimination because of his alleged failure to have raised a triable issue of fact as to whether similarly situated comparators, not in the protected class, were treated more favorably.  Defendant's Brief p. 16; Geyer's Brief p. 6.  For present purposes, I will presume that a prima facie case has been established since the burden there is "much less onerous than proving pretext with similar evidence."  <u>See</u> <u>Opsatnik v. Norfolk Southern Corp.</u>, 2008 WL 763745 at *4 (W.D.Pa. 2008); <u>aff'd</u>, 335 Fed. Appx. 220 (3rd Cir. 2009).

DPW's articulated reason for terminating the Plaintiff was that he sexually harassed female employees in violation of the DPW's Sexual Harassment Policy.  Def. Ex. 60. Consequently, to defeat the Defendants' summary judgment motions, the Plaintiff must point to some evidence "from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  <u>Stanziale v. Jargowsky</u>, 200 F.3d 101, 105 (3rd Cir. 2000); <u>Brewer v. Quaker State Oil Refining Corp.</u>, 72 F.3d 326, 331 (3rd Cir. 1995).

A plaintiff can establish the first prong by "demonstrat[ing] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them 'unworthy of credence.'" <u>Fuentes v. Perskie</u>, 32 F.3d 759, 765 (3rd Cir. 1994) (quoting <u>Ezold v. Wolf, Block, Schorr & Solis-Cohen</u>, 983 F.2d 509, 531 (3rd Cir. 1992)).  A plaintiff may not, however, "simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent."  <u>Keller v. Orix Credit Alliance, Inc.</u>, 130 F.3d 1101, 1108-09 (3rd Cir. 1997) (quoting <u>Fuentes</u>, 32 F.2d at 765).  In other words, the plaintiff must show "not merely that the employer's proffered reason was wrong, but that it was so plainly wrong that it

cannot have been the employer's real reason." Keller, 130 F.3d at 1109.

To satisfy the second prong, the plaintiff must point to evidence "that proves ... discrimination in the same way that critical facts are generally proved -- based solely on the natural probative force of the evidence." Keller, 130 F.3d at 1111.  The plaintiff can establish the second prong by showing that the employer in the past subjected him to unlawful discriminatory treatment, that the employer treated other, similarly situated persons not within his class more favorably, or that the employer discriminated against other members of his protected class. Fuentes, 32 F.3d at 765.

In this case, the Plaintiff's claim of pretext is based largely on his contention that he was disciplined more harshly than two other male employees who engaged in similar conduct but were not terminated.  Specifically, the Plaintiff points to Michael Winger ("Winger") and Curt Anderson ("Anderson") as appropriate comparators.  Evidence that an employee was disciplined more severely than an employee in a non-protected class is relevant only if the comparators and the plaintiff are "similarly situated."  Maull v. Div. of State Police, 39 Fed. Appx. 769, 773 (3rd Cir. 2002) (citing Fuentes, 32 F.3d at 765).  "Similarly situated" does not mean "identically situated," but the plaintiff must generally demonstrate that he was similar to the alleged comparators in all relevant respects.  Opsatnik, 2008 WL 763745 at *7.  As this Court stated in Jones v. Polk Center, 2009 WL 700686 (W.D.Pa. 2009):

> ...In the discipline context, a plaintiff must show that the alleged comparator's acts "were of comparable seriousness to his own infraction, and that the [comparator] engaged in the same conduct without such differentiating or mitigating circumstances as would distinguish the [comparator's] conduct or the employer's resulting treatment of [him]."  *Tyler v. SEPTA*, No. Civ. A. 99-4825, 2002 WL 31965896, at *3 (E.D.Pa. Nov. 8, 2002) (alterations in original), *aff'd*, 85 F. App'x 875 (3rd Cir. 2003); *see also Jackson v. Bob Evans-Columbus*, No. 2:04cv559, 2006 WL 3814099, at *7 (W.D.Pa. Dec. 22, 2006); *Ogden v. Keystone Residence*, 226 F.Supp.2d 588, 603 (M.D.Pa. 2002) ("Showing that an employee is similarly situated is not easy task.").  Whether alleged comparators are indeed similarly situated is a case-specific analysis, and one which is appropriate for the district court to evaluate at the summary judgment stage.  *Maull*, 39 F. App'x at 769 (citing *Simpson*, 142 F.3d at 645).

Jones, 2009 WL 700686 at *7 (quoting Saillam v. Norfolk, 2008 WL 5286836 at *9 (W.D.Pa. 2008).

As to Winger, the record reveals that he was the subject of a sexual harassment complaint based upon information reported by DPW employee Larry Hughes. Def. Ex. 61. According to an investigative report dated April 15, 2005, Hughes complained that Winger constantly engaged in conversations relating to his sexual experiences. Def. Ex. 61. Hughes also reported that on one occasion Winger had placed his hands on a female employee's hips and pulled her towards him. Def. Ex. 61. In addition to complaining about Winger, Hughes also reported that a female co-worker lifted her shirt to display her bra to others. Def. Ex. 61.

When confronted with Hughes' allegations, Winger denied engaging in the conduct attributed to him by Hughes. Def. Ex. 61. Eleven witnesses were interviewed who acknowledged that they heard Winger "joke around" but claimed that they were not offended by his comments. Def. Ex. 61. No witnesses were aware that Winger had engaged in any inappropriate physical contact as alleged by Hughes. Def. Ex. 61. The female employee denied that she had exposed her bra in the manner described by Hughes. Def. Ex. 61. Only Carla Hughes, Hughes' wife, reported that she was also offended by Winger's language. Def. Ex. 61. As a result of its investigation, the DPW concluded that the allegations against Winger were unsubstantiated and the complaint against him was dismissed. Pl. Ex. 3, Hanwell Dep. pp. 105; 135-136.

Here, Winger provides no support for the Plaintiff's claim of pretext because the record establishes that he and the Plaintiff were not similarly situated. The nature of the allegations against Winger were in no sense comparable in severity or scope to those made against the Plaintiff. See, e.g., Wheeler v. Aventis Pharmaceuticals, 360 F. 3rd 853, 858 (8th Cir. 2004) (concluding that the plaintiff and comparator were not similarly situated because although they were both involved in sexual "horseplay," their actions "involved differing levels of misconduct" and the employer "was not obligated to treat the two behaviors as substantially similar because they involved objectively different conduct); Egued v. Postmaster, 155 Fed. Appx. 439, 441 (11th Cir. 2005) (holding comparator was not similarly situated to plaintiff where only one individual accused comparator of uninvited sexual touching and plaintiff was accused by four women of verbal and repeated uninvited sexual touching). In addition, DPW concluded that the allegations against Winger, unlike those against the Plaintiff, were unfounded. See e.g., Hysten v.

16

Burlington Northern and Santa Fe Railroad Co., 167 F. Supp. 2d 1239, 1244 (D.Kan. 2001)
(finding plaintiff and comparator were not similarly situated where plaintiff's conduct was
substantiated and purported comparator's conduct was "unsubstantiated"); aff'd, 296 F.3d 1177
(10th Cir. 2002).  Therefore, Winger's circumstances are not sufficiently similar to the Plaintiff's
so as to create an inference of discrimination.

Plaintiff fares no better with respect to the other alleged comparator, Anderson.
Anderson was a Food Service Supervisor at Polk Center who was suspended in August 2005
following the discovery of sexually explicit notes written by him to a subordinate employee.
Def. Ex. 69, Garin Dec. ¶ 6.  The ensuing investigation revealed that Anderson and the
subordinate employee had been engaged in a voluntary, consensual sexual relationship from
October 2004 until July 2005.  Def. Ex. 69, Garin Dec. ¶¶ 9; 12.  The subordinate employee
acknowledged engaging in consensual sexual activity with Anderson on Polk Center premises,
and also informed the investigator that Anderson had signed various leave slips for her, brought
pornographic material onto the worksite and taken approximately five cans of Pepsi per day from
the Dietary Department without authorization.  Def. Ex. 69, Garin Dec. ¶ 9; Def. Ex. 70.

Anderson was a member of Council 13, American Federation of State, County, and
Municipal Employees ("AFSCME"), AFL-CIO, District Council 85, Local Union 2367, and he
filed a grievance on August 23, 2005, claiming that his suspension was without just cause.  Def.
Ex. 69, Garin Dec. ¶ 13.  The grievance procedure applicable to AFSCME members also
included a multi-level grievance process similar to that discussed in connection with the Plaintiff.
Def. Ex. 69, Garin Dec. ¶ 18.  In Anderson's case, however, the grievance was resolved at the
first step with an agreement reached between Barnes, Robert W. Calvin, the AFSCME union
representative, and Anderson.  Def. Ex. 69, Garin Dec. ¶ 14.  Pursuant to the agreement,
Anderson's suspension was converted to a 30-day suspension with a Final Warning.  Def. Ex. 65.
He was voluntarily demoted to a semi-skilled laborer with a reduced pay scale, and he agreed to
withdraw his appeal of his unemployment compensation claim.  Def. Ex. 65.

As with Winger, I find that Anderson and the Plaintiff were not similarly situated.  Here,
the DPW, through Hanwell, explained the basis for its decision to impose a lesser disciplinary
sanction on Anderson than it had on the Plaintiff:

Q.      ... And what was it about Mr. Anderson's conduct that distinguished him from the allegations against Dr. Moussa justifying a 30-day suspension rather than removal from employment?

A.      The primary distinction was the absence of a person who was victimized by unwanted behavior.

Q.      So consensual sexual intercourse is not as bad as an unwanted kiss?[4]

A.      The key word is consensual and in this case the other employee freely admitted that these things had occurred and did not indicate at any time that she was resistive to the activity.  So, yeah, that's a big distinction, wanted action versus unwanted.  That's oftentimes the key distinction made in determining whether there's criminal activity.

Pl Ex. 3, Hanwell Dep. pp. 112-13.  The rationale supporting DPW's decision to terminate the Plaintiff and suspend Anderson as articulated by Hanwell is, in no sense, objectively unreasonable or capable of raising an inference of pretext.  As discussed more fully above, the Defendant received complaints from three women, corroborated by others, that alleged a pattern of sexual harassment, both verbal and physical, over a protracted period of time.  In contrast, the most serious allegation against Anderson, credited by DPW, was that he had engaged in a consensual sexual relationship with a subordinate employee over nine months.  See e.g., Wheeler, 360 F.3d at 858; Egued, 155 Fed. Appx. at 441; Hawn v. Executive Jet Management, Inc., 546 F. Supp. 2d 703, 719 (D.Az. 2008) (holding that male pilots terminated for alleged sexual harassment of female flight attendant failed to establish that employer treated similarly situated female employees more favorably where female flight attendants conduct was not unwelcome and employer never received sexual harassment complaints about them); Loyal v. Indianapolis Public Schools, 2006 WL 406681 at *3 (S.D.Ind. 2006) ("A similarly situated employee in this case would be someone who was 'the subject of comparable complaints of sexual harassment.'") (citations omitted); Silverman v. City of New York, 216 F. Supp. 2d 108, 118 (E.D.N.Y. 2002) (finding plaintiff and comparator were not similarly situated where plaintiff's conduct in sexually harassing underage intern could be viewed as objectively more

---

[4]I note, parenthetically, that Plaintiff's counsel's characterization of the Plaintiff's alleged conduct as "an unwanted kiss" significantly understates the scope and seriousness of the allegations leveled against the Plaintiff as described more fully above.

serious than comparator's sexual relationship with complainant who participated willingly),
aff'd, 64 Fed. Appx. 799 (2nd Cir. 2003).

In sum, given the lack of a similarly situated comparator, or for that matter, any other
evidence raising a material issue of fact as to pretext, I conclude that summary judgment is
appropriate with respect to the Plaintiff's claims based on race/national origin discrimination.

*Retaliation*

Plaintiff alleges that Geyer retaliated against him because he filed a civil rights action
against DPW in 2000.[5]  Complaint ¶ 60.  Contrary to the Plaintiff's characterization of his
retaliation claim, <u>see</u> Plaintiff's Brief pp. 8-9, this claim is properly construed as a First
Amendment retaliation claim.  "'[A] pure or generic retaliation claim ... simply does not
implicate the Equal Protection Clause.'"  <u>Thomas v. Independence Twp.</u>, 463 F.3d 285, 298 n.6
(3rd Cir. 2006) (quoting <u>Watkins v. Bowden</u>, 105 F.3d 1344, 1354 (11th Cir. 1997)).  In order to
establish a prima facie case of retaliation, the Plaintiff must produce evidence to demonstrate: (1)
constitutionally protected conduct; (2) retaliatory action sufficient to deter a person of ordinary
firmness from exercising his constitutional rights; and (3) a causal link between the
constitutionally protected conduct and the retaliatory action.  <u>Thomas</u>, 463 F.3d at 296 (citing
<u>Mitchell v. Horn</u>, 318 F.3d 523, 530 (3rd Cir. 2003)).  In addition, "the plaintiff must make some
showing sufficient for a reasonable trier of fact to infer that the defendant was aware that the
plaintiff had engaged in protected activity."  <u>Raad v. Fairbanks North Star Borough School Dist.</u>,
323 F.3d 1185, 1197 (9th Cir. 2003); <u>see also</u> <u>Ambrose v. Robinson</u>, 303 F.3d 488, 493 (3rd Cir.
2002) ("It is only intuitive that for protected conduct to be a substantial or motivating factor in a
decision, the decisionmakers must be aware of the protected conduct.").

Geyer argues that she played no role whatsoever in the investigation or ultimate decision
to terminate the Plaintiff and merely signed the Plaintiff's letter of termination at the direction of
her supervisor, Murray.  As discussed above, the record supports Geyer's contentions.  She did
not commence work at the Polk Center until November 5, 2005, after the Plaintiff had been

---

[5]Plaintiff had been hired as a Staff Physician at Polk Center on February 10, 1986 and was subsequently
terminated in February 1999 for alleged improper medical practices.  Complaint ¶¶ 9; 12.  He was subsequently
reinstated in January 2000 after charges by the Medical Board were dismissed.  Complaint ¶ 12.  Plaintiff's lawsuit
against DPW ultimately settled in the later part of 2002.  Complaint ¶ 10; Geyer Ex. 1, Moussa Dep. pp. 11; 52-54.

suspended and the investigation into his conduct was well underway.  Pl. Ex. 1, Geyer Dep. pp. 7-8.  Her contention that she was unaware of the Plaintiff's prior lawsuit at the time she signed his termination letter stands unrebutted.  Pl. Ex. 1, Geyer Dep. pp. 10-11; 20; 22-23.  Summary judgment is therefore appropriate as to Defendant Geyer.[6]

## IV. CONCLUSION

For the foregoing reasons, the Defendants' motions for summary judgment are granted. An appropriate Order follows.

---

[6]Given the fact that the Plaintiff's termination was temporally remote from the conclusion of his prior lawsuit, no inference of causation arises.  See e.g., Andreoli v. Gates, 482 F.3d 641, 650 (3rd Cir. 2007) (five month time period, without additional evidence, insufficient to raise an inference of causation); LeBoon v. Lancaster Jewish Community Center Association, 503 F.3d 217, 233 (3rd Cir. 2007) (gap of three months, without more, cannot create an inference of causation); see also Clark County School Dist. v. Breeden, 532 U.S. 268, 273-74 (2001) ("The cases that accept mere temporal proximity between employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close'... .  Action taken (as here) 20 months later suggests, by itself, no causality at all.").  Moreover, there is no evidence on this record of any intervening antagonism sufficient to independently raise an inference of causation.  See e.g., Karchmer v. SunGard Data Systems, Inc., 109 F.3d 173, 177 (3rd Cir. 1997) (absent temporal proximity, "circumstantial evidence of a 'pattern of antagonism' following the protected conduct can also give rise to the inference.").  Consequently, summary judgment would be independently supportable on this ground as well.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| SAMIR MOUSSA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-9 Erie |
| | ) | |
| PENNSYLVANIA DEPARTMENT OF | ) | |
| PUBLIC WELFARE and | ) | |
| STACY GEYER | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER**

AND NOW, this 31st day of March, 2010, and for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that the Motions for Summary Judgment filed by Defendant, the Pennsylvania Department of Public Welfare [Doc. No. 44 and Doc. No. 63] and Defendant Stacy Geyer [Doc. No. 38] are GRANTED.  JUDGMENT is hereby entered in favor of the Defendants, Pennsylvania Department of Public Welfare and Stacy Geyer, and against the Plaintiff, Samir Moussa.

The clerk is hereby directed to mark the case closed.


s/ Sean J. McLaughlin
United States District Judge


cm: All parties of record.